7-1-7-11, John Burston et al. v. Putnam Investments et al. 7-1-7-11. Mr. Castor, good morning. Good morning, Your Honor. Jim Castor for the appellant. May it please the Court, I'm here today with Kai Richter and John Burston, the main plaintiff. Kai Richter, my co-counsel. I would ask to reserve three minutes for rebuttal, if possible. You may. Thank you. The record before this Court establishes a breach of fiduciary duty by Putnam Fiduciaries and losses to the plan for Putnam employees of $44 million. But the trial court dismissed the case on Rule 52 motions saying we did not prove a prima facie loss sufficient to sustain a portfolio-wide damage model. This was error and should be reversed. The trial court also committed plain error on counts 2 and 3 in giving a credit to Putnam Financial for the matching contributions for employees. There is no precedent for such a credit. As it relates to the trial errors, counts 1, 4, and 5, we proved breach. The trial court basically said as much, saying he would be warranted in finding a breach of the duty of prudence. We proved losses. The Restatement Section 100 says you can prove losses by comparing the performance of the investments to index funds. We did that. We compared them to Vanguard funds. The Restatement Section 100 also says you can prove losses by comparing the funds in question to other suitable portions of the portfolio. We did that with BNY Mellon funds. This court has said in Evans v. Akers, losses to a plan for breaches of duty of prudence may be ascertained with the help of expert analysis by comparing the performance of the unproven investments to the performance of a prudently managed portfolio. That is how we did this. In the CBS case just a couple of weeks ago, this court said losses can be measured by the difference between the challenged funds' performance and comparable funds where the flaw can be reasonably inferred from allegations of self-dealing. That applying CBS and the Evans case in this circumstance is their evidence of a breach of the duty of prudence. In table, the U.S. Supreme Court said that prudence, the heart of prudence, involves selection of the investments, monitoring of the investments, the existing investments in the plan, and removal of imprudent investments. This court essentially said the same thing in the Bunch case and repeated that two weeks ago in the Ellis and CBS cases. Applying that to Putnam, there were no standards for admission of new funds. They were admitted by fiat. There was no monitoring by the fiduciary of the funds during the class period. None. And there was no removal of funds ever, even in the face of dramatic evidence of failures and abysmal performance. The funds were imprudently managed. I think that's beyond dispute on this record. If we go back to the beginning, to the selection of the funds, or rather the acquiescence in the selection of the funds, what do we have of, we know that they selected funds that were generally fee-based funds, in other words you were paying a premium to have a stock picker manage and pay attention to the fund as opposed to avoiding that premium and using an index fund. So we know they were making that decision. Was there any information that they had at the time, or was there available information at the time, on the prior record of those Putnam funds as to whether or not they had exceeded in performance the index funds by the amount of the fees? New funds were admitted by fiat when they were created, Your Honor. There was no track record. Dr. Pomerance testified as to this, and there are witnesses, starting with Mr. Goodfellow, who I examined at the beginning of the case, who was a member of the fiduciary committee, the PBIC, for the entire time. There was no track record. What about the non-new funds, the carryover funds, the pre-existing funds? I don't think that we have any evidence of any due diligence during the statutory period done ever for funds, except they would argue that the investment division looks at these things. But new funds were admitted by fiat. Under the charter, they admitted the new funds. There was no track record. And in fact, Dr. Pomerance testified, that's one of the problems with new funds, is they're inherently more expensive as a new fund. So when you put them in, the funds, the plan blew up to 70 or 71 funds by the time of the statutory period. Applying them, so under Evans, we clearly have dramatic evidence of imprudence. In fact, I would say an abdication of responsibility by the fiduciary, a complete abdication. But this court referenced two weeks ago self-dealing allegations, so let's talk about that. New funds were admitted by fiat. They talked, and this is in evidence, the committee talked for years about adopting an investor policy statement. And the notes and the testimony reflect this, that after debating this for years, they finally decided not to have one, because it was better not to have one than to have one and not follow it. That's exactly what the notes, the minutes reflect. They have no preferred funds, because it might create an employee relations issue, not for line employees, for the investment managers who would be angry about their fund not being a preferred fund. That's clearly a breach of the duty of loyalty. They buried evidence of failures in the spring of 2010 by not getting their own subsidiaries reports about performance when a third of the funds got an F, failed. And they wondered in the minutes, silently, what would it take for Putnam to remove a fund? For Putnam, the entity, not the fiduciary, completely abdicating its own responsibility, they also charged the employees more for the same services than they charged the general public. As I understand it, the district court, at least arguendo, sort of agreed with you that there was a breach here of the duty, or at least was willing to assume there was a breach, but found against you on that theory based on loss causation. There's some confusion in my mind about exactly who is the plaintiff here, but I think what you've got is you've got a class of individual investors for whom the loss causation argument the court made seems to be pretty good, but I think they're also proceeding on behalf of the plan, right? That's correct. We're proceeding, Mr. Broderston is proceeding, essentially, what is a derivative claim on behalf of the plan. That is the purpose here. And with respect to the causation issue, let me go to that, Your Honor, because the court said in footnote 15 that he was adopting the lower standard, the prima facie standard, which is related and sort of a de minimis causation standard, but then it actually applied the approximate cause standard. I would submit on this record there's one cause. We're not talking about a market event, an aberrational Black Monday, or a stock drop case. We're talking about measuring the losses against the market. The plan gets measured against the market. That's what the index fund represents. And for the entire statutory period, the losses, Dr. Pomerantz mapped individual funds from within Putnam to Vanguard, each comparable fund, did that on a performance level, and then did it on an expense level. Did the same thing for BNY Mellon. There was no objection to the mapping. Not in the Dahlberg motion before trial, not during trial. And by doing that, he did exactly what this court said in Evans v. Akers. But the cause, I mean, there's a split in the circuits on this prima facie loss versus approximate cause standard. I understand that. There's a lot of attention devoted to this issue in the briefing, but I would say this. It also comes down to the would have question, would have. Would a reasonable, prudent fiduciary have selected this menu? That's the issue. They contend it's our burden. We contend it's their burden. But in any case, Dr. Pomerantz looked at 2,600 other fiduciaries' plans and found that 51 of the 69 funds that he looked at had no placements. One fund had 20, 21, less than a 1% penetration. Could I ask you about your other claim having to do with the rebates? And as I understand, the argument that defeated you below was, okay, we don't pay the rebates to the plan or its servicer that we do for third-party plans, but what we do is we pay the servicing fees ourselves directly, we match employee contributions, and then we bear some of the expenses of doing some functions that I think they imply the third-party plans do on themselves. If we throw out the matching contributions for a moment, just assume those are put to one side, what do we have in the record that compares the rebates that are paid, the size of the rebates, which I think you say are 25 basis points, to the service fees, which I think you say at one point are three basis points, plus this other, what do you say about this other element that they say they perform some functions? The record, I think, the stated record on counts two and three establishes that what Putnam provides to the plan is record-keeping fees, which are three basis points, and what they rebate to other plans, but the CEO of Mr. Reynolds decided not to rebate to the employees' plans, is 25 basis points. That's the comparison, Your Honor. I'm not aware of any other... But they say in their brief that they do some other stuff, some functions that the plan themselves would otherwise have to do, but here Putnam does. They have investment services where you can call up and get some investment advice. I think that's available generally to the public at large, Your Honor. I'm not aware of any other quantifiable number. The issue is strictly, and the reason why Putnam went to the matching contributions is because it was clear on the record that without those, they charged the plan more than they charged the general public. That, I think, is undisputed on this record, Your Honor. Back to the cause question, since the court asked about that. There's one cause here. The complete abdication of responsibility by the Putnam fiduciaries. No standards for admission of funds. No removal of a fund ever. And no monitoring by the fiduciaries during the course of the entire statutory period. That's admitted by Mr. Goodfellow, and Dr. Pomerantz testified to the same thing. The only thing that looks a little like monitoring is in the spring of 2010 when they get the AAG reports. I'll sit down. You can finish your sentence. Okay. The AAG reports, and they decide not to look at those reports again. Thank you, Your Honor. Thank you. Mr. Carroll, good morning. Good morning, and thank you. There's some significant limitations being taken with the record, but I want to focus particularly on the legal regime and how this works. References was made to the recent decisions in this court both in CVS and Ellis, and the fundamental failure of proof here is similar to what we saw in those cases. In CVS, there was criticism that a stable value fund held too much cash and therefore didn't perform as well as some other stable value funds performed, which you know is the benefit of hindsight. In Ellis, the criticism was directed to a managed income program and RAP insurance associated with a fidelity option, and the criticism there was that fidelity was disloyal and bought insurance that was too conservative because it was trying to satisfy some other aims, not for the benefit of the particular plan participants at Barnes & Noble. Those cases failed because the plaintiffs skipped the critical step, and that's just what happened here. The plaintiffs go from criticisms about process that the plaintiff is now saying are unrebutted, well, the defendants didn't put on their case yet, but take them as they are. He says they're unrebutted to criticism process to a calculation of damages based upon after the fact analysis. I'm having trouble seeing what is so problematic about the way their expert does that when the fiduciary, in theory, starts out saying I've got all these index funds that essentially charge no fee or a tiny fee, and then I've got these Mercedes over here that charge me a fee. I'm nuts if I pick the Mercedes unless I think it's better than the ones that I don't have a fee, so you would expect to see some due diligence done to see that these warrant the extra fee that all the beneficiaries are going to be charged, and what we're told is nothing was done. They took them automatically because they felt they were obligated to take all funds, and that's the record we're assuming is the case before you can put on your defense. Well, if that's the case, it seems to me the way to calculate whether there was any damage caused by such a defalcation is to say, well, suppose they hadn't picked the high-priced one without having a justification, that in the absence of a justification they just took the index funds. What would have happened, and Pomerantz has calculated that, and basically he's shown that the Putnam funds didn't do quite as well as the index funds and then hammered the participants with $37 million in fees for the privilege of not doing quite so well. That sounds like a decent damage case. With the greatest respect, I'm going to assume the assertions for the moment are true with respect to the process. To make out a breach of the duty of prudence claim, a plaintiff must do a couple of things. It's not enough to say there was a problem with the process. They also have to demonstrate that the investment option was improved, very clearly spelled out in the faint case we cite and also in the placerous Fourth Circuit case. So a breach of the duty of prudence is both of those things. The plaintiffs make a criticism about process, but they skip over the analysis of when, if ever, any of the investment options were imprudent and why. If I'm offered two popsicles and one costs five cents more than the other, isn't it imprudent just to take the more expensive one without even asking? Is it any better? Is it any different? Is it packaged differently? That sounds to me like a definition of imprudence. I think the answer is, you put your finger on it, imprudence has to be measured by information available to the prudent fiduciary at the time, much like in the CVS case where the plaintiffs never say, well, how much cash would a prudent fiduciary have put in that stable value fund? And that has to be evaluated at the time, not just by virtue of comparing it with what someone did in other stable value funds that happened to do better. What the plaintiffs do here is move from a process criticism to an assumption that every investment option, every single one, 69 different mutual funds, over a seven-year period itself was imprudent for all investors at all times. And that's an assumption that the law doesn't support, because you need to connect up the criticism about the process to whether there in fact was an imprudent investment option. I'll bring back my Ouija board. You're saying here that if problems, fiduciaries, instead of getting together and looking at the funds and how they've done, simply said, should we go for the low-priced one or the high-priced one, they pulled out the Ouija board, it says high-priced, they take that. You're saying that if we want to find out if there was any damage as a result of that defalcation, we can't just look at how their choice did compared to what the other obvious choice was that was sitting before them that they opted not to take without doing anything that a fiduciary should do if we assume the record is as it is before you get to put on your defense. I'm saying that's something a little bit different, respectfully, Your Honor. There's not an option of let's pick an actively managed Putnam fund versus an index fund. There's tens of thousands of mutual funds out there. Sure, but the obvious one to start out with is the low-cost one, particularly though the literature is saying they generally do as well or better than the others. You've got the testimony that goes in reciting the work of a Nobel laureate that explains that point, and you've got Putnam over here selling this higher-priced thing, and then you've got Putnam's people putting their beneficiaries into it without investigating whether the higher price is worth it. Well, again, not quarreling with the process facts for the moment, but it's not quite like that. The analysis of the fiduciary conduct, and this is consistent with Bunch and his progeny, has to be done at the time. What information would that fiduciary take and have in mind with respect to what's best for their planned participants? Putnam is an actively managed mutual fund company. They, and have done for many decades, create, manufacture, monitor, sell, improve open-ended mutual funds among many, many other products. These open-ended mutual funds are what the very people who are the planned participants work on every day. The people who have testified in this case as fact witnesses, these are the plaintiffs' witnesses, as they call them, they want to invest in the Putnam mutual funds because they know them well and they're themselves responsible for investing in them. The fiduciary conduct has to be looked at at the time. Why is it that this court would accept an assumption of imprudence for the Putnam equity income fund? That fund's been in existence since the 1970s. It's a conservative fund that looks to buy companies that pay dividends. It doesn't try and hit home runs. It's been a very steady performer. In the class period in this case, the equity income fund outperformed its benchmark, that is to say, the benchmark of peer funds like money funds. So no damages were accrued as a result of that? Not according to the plaintiff's analysis. The plaintiffs say that fund was imprudent for every moment of this class period. Well, I think they say in calculating damages that if that fund outperformed the index, you actually get a credit under the damage analysis. The fact that the plaintiff's analysis has to give a credit makes plain that it's answering the wrong question. The credit shows that the question being answered is, how did this fund perform with the benefit of hindsight against another fund? It's just a mathematical exercise. It does nothing to answer the question that matters under budge. Was this an imprudent investment or not? And if so, why? And if so, when? What is it about this fund? How much cash should have been in the stable value fund to use a CVS analogy? What is it about this fund that made it imprudent? That fund I mentioned outperformed its benchmarks one year, three year, five year during the class period. It sits in 493 401k plans across the country. Other fiduciaries, 493 investment committees of unrelated plans, have found that good performing fund to be a prudent investment. It's true. I think what you're pointing out is if you select 79 funds to put in a plan and you use a Ouija board or the advice of a five-year-old kid, you're going to end up with some of the funds being good funds. Some will wind up being prudent to be sure. Right. And I think as I understand your analysis, the only way to collect damages is to take all 79 funds and then ask, okay, if a more responsible prudent investment decision had been made back at that time with respect to this fund, and on each day thereafter for the class period whether to retain that fund or not, you'd have to show that someone would, if they had directed their attention to it, have come to a different decision than the Ouija board did. What I say is slightly different. I'm saying that it is part of the plaintiff's case and a duty of prudence case to prove that the investment option they're complaining of is actually imprudent. To evaluate fairly the fiduciary conduct at the time, why is it that the fiduciary shouldn't have put the equity income fund among the investment choices? Plaintiffs don't answer that question. They simply say, here's another fund that happened to do better. Well, you can always pick another fund that happens to do better. That doesn't tell you whether at the time the fund that was in the plan was imprudent. The way that's proven is to pick funds and say, well, at the time a fiduciary would have known that X fund had a track record of incredible volatility or that it was investing in the kinds of investments that aren't appropriate for long-term 401 retirement investors or perhaps that the management of some fund had turned over repeatedly and they weren't using a consistent dependable investment process that was consistent with its stated aims. To simply say that an actively managed mutual fund which sets out to attempt to beat the market becomes imprudent because it didn't happen to, in this particular time frame, perform as well as a passively managed index fund that only seeks to meet the market confuses fundamental concepts of prudence and performance. It's always been the law. Suppose I'm your fiduciary and I have $1,000 that have been left to me by your parents to go out and buy something for you and I go to the store and there are two things that have identical characteristics except one comes with this other feature that costs 2% more and I don't even pay any attention to whether the other feature is worth anything. I buy the higher priced one, come back, and the evidence shows the other feature produces no value to you. What would be your damages? The damages would be the 2% of the trust funds that I just wasted by buying an unnecessary feature without any investigation as to whether it did anything and the damages would only add up, you could only recover from me, if it turned out that feature didn't produce anything. So if it is the equity fund, there are no damages. Damages may be, and indeed must be, I submit, calculated with some measure of hindsight. You wouldn't calculate the damages to me in your hypothetical until you had some proof of why the fiduciary was mistaken in buying that extra higher priced bell and whistle that was on his investment. Paying more for something without any reason to think it's worth more is imprudent. And you'd have to look at the facts and circumstances of that at the time the fiduciary made it. None of that happened here. None of it. All that happened is the plaintiff had a process criticism, and Judge Young didn't find it, the defendants hadn't put on the case yet, but assume that he did. You still have to connect up, all the cases require that you still have to connect up the claim of a breach of process with there actually being an imprudent investment. And the fact that Dr. Pomerantz would give a credit exemplifies the fact that he's answered the wrong question. The plaintiff's had a complete failure of proof in attempting to demonstrate imprudent investments. And here's another point of the record that's unrebutted that makes that crystal clear. The plaintiff's proffered a process expert. Someone came in and criticized the process. And that process expert testified, and this is in the court's record below, that it was unrebutted that the selection of certain funds, these Putnam Retirement Ready funds, was done in a prudent manner. He approved of the process there and used it to contrast other funds that he criticized. So the process expert says, the way you're monitoring those funds, that's prudent. The damages expert comes along and says, I'm assuming those are imprudent and here's the amount of damages you owe for them. That shows the problem. There's an assumption between process criticisms and movement directly to a damages calculation. That's all it is that Dr. Pomerantz did, without any evaluation of the attributes of the investment options at the time. So now I think if I understand you're saying there's a misalignment between the liability theory and the damage theory, because one said A, B, C, and D were negligent, but E wasn't, while the other is predicating damages on all of them being. What I'm saying is they never tried to prove E. But we don't have a finding on that, do we? There's no finding. The plaintiffs didn't come forward with any evidence whatsoever to say why it is that any investment... My question is, do we have a finding from Judge Young that there's a misalignment of the type you're talking about now? If we're communicating with another, what you have is Judge Young's holding that the plaintiffs don't come forward with proof of prudence in the way that they're required. He found they effectively skipped directly to the damages. The way he said it was they didn't meet an element of their claim, and they didn't. They simply say process criticism, let's start calculating damages, missing the critical middle step. And it's the same step that was missed with respect to the plaintiffs It's not saying how much cash is too much in CVS, or the plaintiffs saying how restrictive can insurance be without it becoming imprudent in Ellis. It's the fundamental part of a duty of prudence case. It's not just process criticisms. Duty of prudence requires monitoring and investigation, but it also requires for there to be a claim and imprudent investment. Plaintiffs skipped that step. They assumed it to be the case. No evidence was offered in that regard. That's the basis of the district judge's decision, which is entirely correct. Thank you. Thank you, counsel. May it please the court, with respect to the arguable misalignment between our experts, Martin Schmidt, the process expert, testified, joint appendix 2453, that what Putnam did with its retirement funds was they compared them, and they did that. It's really the only monitoring they did. But they compared them against other Putnam funds. So it was more prudent, and he did use that word, than the rest of the funds, the QDIA, which were 10 funds out of the 70. But with respect to the balance of the funds, and this goes to, I think, joint appendix 1717, Mr. Goodfellow himself admits that there was no monitoring of the balance of the funds ever, and there were no standards for admission of the funds. Putnam complains about hindsight, but to complain about hindsight, you must have exercised foresight. They never exercised the due diligence required of a fiduciary. Let me ask you, here's what I think I'm understanding is the argument from the other side in the briefs, and then refined and focused on here today. I think the example that the other side seems to have in mind is, imagine if the fiduciary picks one fund, and it does so completely negligently, or it uses a wager board, all right? But lo and behold, that fund it picks is the same fund that the 20 best fund managers in the country all would pick. So that's the scenario, negligent process, but they got lucky and picked the same one that they would have. Then that fund, over five years, actually does less well than the market index does. They would say, I think, that under Pomerantz's theory there would be a damage claim, whereas in reality there shouldn't be, because even though the process was defective, the actual choice was a prudent choice, and you shouldn't therefore have any damages, just because it didn't do as well as the index. Well, under Dr. Pomerantz's analysis, he gave them a credit for that fund. The example I gave you would not give a credit, because it happened, even though it was substantively prudent, it turned out not to do as well as the market, as substantively prudent investments might do. In that particular example, Your Honor, if prudence, the DOL has said there is no intrinsic measure of a prudent fund or an imprudent fund. The Finn case that they talk about is actually the dissent in the Finn case. This court has said in Bunch and recently in Ellis and CVS, you measure prudence by the objective process, by conduct. Did you look at these various things at the time? So under the Bueschen case, which is a Fifth Circuit case, but I think really demonstrative of the point here, they complain, the plaintiffs complain about parking the plan with Executive Life, and said, pointing to an earlier case where the trial court judge had said Executive Life was a prudent choice. The court on appeal said, that earlier decision doesn't render Executive Life intrinsically prudent. You look at the process at the time. You have to examine, process is the heart under Tybalt of prudence. If you look at what you were considering at the time, Putnam did none of those things. What they are asking for, what the chamber indicates to the court, they are asking for is a very wide berth, essentially adoption of a blind person standard. That is completely inconsistent with fiduciary obligations. Thank you. Thank you, your honor.